**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**AHMOD D. MANDEN,**

    **Plaintiff,**

**v.**                                               **Case No.  8:07-cv-1003-T-TBM**

**MICHAEL J. ASTRUE,
Commissioner of the United States
Social Security Administration,**

    **Defendant.**
_____/

**O R D E R**

The Plaintiff seeks judicial review of the denial of his claims for Social Security disability benefits and Supplemental Security Income payments.  For the reasons set out herein, the decision is affirmed.

I.

Plaintiff was twenty-seven years of age at the time of his administrative hearing in June 2006.  Plaintiff has a tenth grade education and one days' training as a security guard.  His past relevant work was as a janitor, security guard, and bag boy.  Plaintiff applied for Supplemental Security Income payments and Social Security disability benefits in October 2003 alleging disability as of July 1, 2000, by reason of hand and chest pain from gunshot

wounds, nerves, mental problems, and back pain.[1]  The Plaintiff's applications were denied originally and on reconsideration.

The Plaintiff, at his request, then received a *de novo* hearing before an Administrative Law Judge ("ALJ").  The Plaintiff was represented at the hearing by counsel and testified in his own behalf.  Additionally, a vocational expert was called by the ALJ.

In essence, Plaintiff testified he is unable to work because of his mental state and pain in his back and hand as a result of a gunshot wound.  By his account, he has a tenth grade education but quit school because he became discouraged.  Thereafter he received a days' worth of training to be a security guard.  Plaintiff then worked as a security guard but he lost the job when he got in trouble with the law.[2]  Plaintiff admitted he did four months in county jail for selling counterfeit drugs.  Most recently, Plaintiff worked as a janitor through a temporary agency.  The job ended when the company lost the contract.  In addition, Plaintiff worked part-time as a bag boy at a grocery store while he was going to school.  Plaintiff suggests he is unable to do that job or any other work because of his mental state.  He complains that he loses his mind and cannot stay focused.  Plaintiff acknowledged that he was using marijuana but stopped doing so a couple months prior to the hearing.

---

[1] It appears Plaintiff filed earlier applications for Supplemental Security Income payments and Social Security disability benefits in January 2002 alleging disability by reason of back pain, right hand pain, occasional knee pain, and mental problems.  His claims were denied initially and on reconsideration.  It does not appear that he appealed those decisions. (R. 37, 57, 61, 65, 157, 166, 202, 211).

[2] Plaintiff testified that when he got in trouble with the law he lost his license to be a security guard.  He has been unable to obtain the license since.

Plaintiff described being shot in a robbery attempt in 2000.  By his account, he was riding a bicycle home from work late at night and was confronted and shot.  Since then he has experienced nervousness and concern that people around him are out to get him.  He has hallucinations a couple of times a week where he sees the individuals who shot him confronting him and these last about thirty minutes to one hour.  He indicated he also has nightmares.  Plaintiff is prescribed Zoloft for depression and Risperdal for hallucinations.  He indicated the medications have helped a little bit with his nervousness and depression but they make him sleepy and give him headaches and nausea.

Plaintiff testified to limited daily activities.  He lives with his mother and two younger sisters.  He depends on his mother to support him but he gets county medical care and food stamps.  Plaintiff stays in the house most of the day because he is afraid of people and nervous; he generally watches television and sleeps.  He stated he sleeps eight hours at night and eight hours during the day.  He described repeatedly washing his hands throughout the day.  He does not have many friends, does not socialize, and only occasionally will go out to a restaurant or the mall.  Plaintiff has a driver's license and can drive but he does not have a car.  (R. 455-73).

Additionally, Teresa Manning, a vocational expert ("VE") was called by the ALJ.  The witness testified on the assumption of an individual with the physical ability to work with no exertional limitations but with limitations in the ability to understand, remember, carry out detailed instructions and some limitation in maintaining concentration for extended periods, but able to understand, remember, carry out simple instructions, and perform simple tasks.  On such a hypothetical the witness opined that such individual would be able to perform

3

Plaintiff's past work as a security guard, janitor, or grocery bagger.  In addition, such individual could perform the work as a hotel housekeeper, retail marker, and garment sorter.

On questioning by Plaintiff's counsel, the witness was asked to assume an additional limitation of an inability to maintain concentration roughly thirty minutes at a time three to four times a week secondary to the hallucinations or side-effects from medication.  On that additional limitation, such individual would not be able to perform any of the jobs identified previously and/or no jobs would be available.[3]  (R. 473-77).

Also before the ALJ were medical records outlining the Plaintiff's medical history. These matters are addressed adequately by the parties' memoranda and are set forth herein as necessary.

By his decision of August 21, 2006, the ALJ determined that while Plaintiff has severe impairments related to narcotics addiction, subnormal cognitive acuity, depressive disorder, and possible post traumatic stress/anxiety disorder with anti-social elements, he nonetheless had the residual functional capacity to perform simple tasks and remember simple instructions, although limited in the capacity to understand, recall, and carry-out detailed duties or maintain extended attention to duties.  Upon this finding, the ALJ concluded that Plaintiff could perform his past work  Additionally, on the basis of the VE's testimony, the ALJ concluded in the alternative that Plaintiff was capable of performing other jobs available

---

[3]The testimony is not altogether clear on this point.  *See* (R. 476-77).

in the national economy. Upon these conclusions, the Plaintiff was determined to be not disabled.[4] (R. 13- 25). The Appeals Council denied Plaintiff's request for review.

II.

In order to be entitled to Social Security disability benefits and Supplemental Security Income payments, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment," under the terms of the Act, is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at § 423(d)(3).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards. *See id.* at § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). The Commissioner must apply the correct law and demonstrate that he has done so. While the court reviews the Commissioner's decision with deference to

---

[4]The ALJ also found that even if Plaintiff were found disabled, substance abuse would be a "material part" of his limitations and he therefore would not be entitled to benefits. He found further that benefits would not be warranted in light of Plaintiff's failure to follow prescribed abstinence. (R. 24).

the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

It is, moreover, the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses. *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971). Similarly, it is the responsibility of the Commissioner to draw inferences from the evidence, and those inferences are not to be overturned if they are supported by substantial evidence. *Celebrezze v. O'Brient*, 323 F.2d 989 (5th Cir. 1963). Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the court is not to re-weigh the evidence, but is limited to determining whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the claimant is not disabled. *Miles*, 84 F.3d at 1400; *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983).

The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

III.

The Plaintiff raises a single claim on this appeal. By this claim, Plaintiff contends the ALJ erred by determining that his cognitive condition did not meet the requirements of listing 12.05(C). According to Plaintiff, his full scale IQ score of 69, as found by

psychologist Felix J. Subervi, III, Ph.D., was valid and satisfied the first listing requirement, and his other physical and mental impairments, which imposed more than a minimal effect on his work-related abilities, satisfied the second listing requirement.[5] Plaintiff suggests that the ALJ's error rests on the fact that the ALJ improperly discounted the full scale IQ score of 69 reported by Dr. Subervi by referencing the other medical evidence indicating Plaintiff could sometimes do better. In particular, Plaintiff asserts that informal cognitive test results reported by Linda T. Inatsuka, Ph.D., suggesting a low average score in memory and that Plaintiff was marginally literate, had worked in the past, and completed some high school are not inconsistent with a full scale IQ score of 69 contrary to the ALJ's reliance on the same.[6] Plaintiff contends that the ALJ's finding illustrates the ALJ's arbitrary substitution of his own intuition in place of the medical evidence. In sum, given that he suffered from the stated IQ and other limitations, Plaintiff urges that he meets the listing at 12.05(C)[7] and his case should

---

[5]To this end, Plaintiff points to his diagnoses of depressive disorder, post-traumatic stress disorder, schizophrenia, and a psychotic disorder, which result in feelings of worthlessness, fear of people, sadness, anhedionia, fatigue, nervousness, insomnia, nightmares, anxiety, and hallucinations, as well as chest, back, neck and knee pain.

[6]Plaintiff contends his case is factually distinguishable from *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986), wherein the Court held that a valid IQ score was not conclusive of mental retardation where the IQ score was inconsistent with other evidence in the record about claimant's daily activities. In *Popp*, the court upheld the ALJ's determination that the claimant was not mentally retarded in light of the fact that he was close to completing a bachelor of science degree, it was not alleged that claimant was failing his college courses, claimant had a history of teaching high school algebra, and medical/psychological sources commented on the claimant's exaggeration and embellished answers. *Id.* at 1499-500. Plaintiff contends that, unlike the claimant in *Popp*, his IQ score is not inconsistent with other evidence in the record, namely, marginal literacy, his prior work history, and completing a couple of years of high school.

[7]Plaintiff cites *Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993) for the proposition that "significant" in this context means more than slight or minimal, but less than "severe." In

be reversed and remanded for an award of benefits or, at minimum, for further consideration of the issues. (Doc. 17 at 6-8).

In response, the Commissioner urges that the ALJ's decision was made in accordance with the proper standard and is supported by substantial evidence. By his argument, a single IQ score on its own is not enough to meet the listing. Citing *Crayton v. Callahan*, 120 F.3d 1217 (11th Cir. 1997), the Commissioner urges, as a factual matter, that Plaintiff was unable to establish his mental retardation because none of the psychologists diagnosed Plaintiff with mental retardation[8] and Plaintiff failed to establish significant deficits

---

*Davis*, the Court held that the ALJ erred by failing to consider whether the combined effect of the claimant's allergies and mild carpal tunnel syndrome imposed significant limitations on her functional abilities as required under the second prong of listing 12.05(C). *Id.* at 532. In so holding, the Court recognized that "significant" under section 12.05(C) involves something more than slight or minimal, but less than "severe." *Id.* at 531-32 (citing *Edwards by Edwards v. Heckler*, 755 F.2d 1513, 1517 (11th Cir. 1985)). However, the regulations provide ". . . [f]or paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are 'severe' as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes 'an additional and significant work-related limitation of function,' . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A. At the time *Edwards by Edwards* was decided, the listing did not include an explanation of listing 12.05(C)'s additional impairment requirement. However, the listing included such when *Davis* was decided. The Court in that case did not address the explanation added to the listing at 12.00A.

[8]Citing to Dr. Subervi's records, the Commissioner urges that the diagnosis was borderline or extremely low functioning as opposed to mental retardation. Similarly, Dr. Inatsuka found Plaintiff to be operating at a below average to average range and the state agency psychologists noted that Plaintiff suffered borderline intellectual function as opposed to mental retardation. And, according to the Commissioner, the listings require a diagnoses. In support thereof, the Commissioner cites *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002), (providing that, to meet a listing, a claimant must have a diagnosis included in the listings), and 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00A.

in at least two areas of adaptive functioning.[9] The Commissioner urges that Plaintiff's work history itself demonstrates his ability to function above the mentally retarded level and his report of a number of activities undermines this claim as well. Furthermore, the Commissioner urges that the IQ score of 69 may not adequately reflect on Plaintiff's true ability. He notes that Dr. Inatsuka indicated that there was some exaggeration of Plaintiff's symptoms, a state agency doctor noted a lack of consistency that made the Plaintiff only partially credible, and there were certain inconsistencies in Plaintiff's reporting. (Doc. 18 at 3-9).

At step three of the sequential analysis, an ALJ considers the severity of a claimant's impairments, including whether or not a claimant has an impairment that meets or equals a listed impairment in Appendix 1, Subpart P, Regulations No. 4. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). This listing of impairments in the Social Security Regulations identifies impairments that are considered severe enough to prevent a person from engaging in gainful activity. By meeting a listed impairment or otherwise establishing an equivalence, a claimant is presumptively determined to be disabled regardless of his age, education, or work experience. Thus, an ALJ's sequential evaluation of a claim ends if the claimant can establish the existence of a listed impairment. *Edwards v. Heckler*, 736 F.2d 625, 628 (11th Cir. 1984). The claimant has the burden of establishing the existence of such

---

[9]Citing the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), the Commissioner contends that Plaintiff must demonstrate some significant limitations in communication, self-care, home living, social interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and or safety which evidences themselves before the end of the developmental period. The Commissioner urges that the court reference these matters from the DSM-IV in evaluating the Plaintiff.

an impairment or combination of impairments. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). The alleged impairment or combined impairments must meet or equal all the requirements of a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990). To satisfy the burden, the claimant must present specific findings that meet the various tests listed under the applicable listing. *Bell v. Bowen*, 796 F.2d 1350, 1353 (11th Cir. 1986). Mere diagnosis of a listed impairment is by itself not sufficient; the record must contain corroborative medical evidence supported by clinical and laboratory findings. *Carnes*, 936 F.2d at 1218. If a claimant contends that an impairment equals a listed impairment, the claimant must present evidence that describes how the impairment has such an equivalency.[10] *Wilkinson ex rel. Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987).

Listing 12.05, the listing category for mental retardation, begins with an introductory paragraph, which states that "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A § 12.05. The listing further provides that the "required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied." Subsection C, at issue here, requires a claimant to demonstrate "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of

---

[10]To "equal" a listing, "the medical findings must be 'at least equal in severity and duration to the listed findings.'" *Wilson*, 284 F.3d at 1224. Plaintiff does not argue on appeal that his impairment(s) equaled that of a listed impairment.

10

function." *Id.* § 12.05(C). The Eleventh Circuit has held that to be considered for disability benefits under listing 12.05, a claimant must at least have (1) significantly subaverage general intellectual functioning, (2) deficits in adaptive behavior, and (3) manifested those deficits before age 22. *Crayton*, 120 F.3d at 1219. In addition, for presumptive disability under listing 12.05(C), the claimant must have a valid IQ score of 60 through 70 inclusive, and an additional mental or physical impairment significantly affecting the claimant's ability to work. *Id.* at 1219-20. However, this circuit has recognized that an ALJ may reject a valid IQ score as conclusive of mental retardation where the IQ score is inconsistent with other evidence in the record on the claimant's daily activities and behavior. *Popp*, 779 F.2d at 1499.

The psychological evidence pertaining to Plaintiff's claim is limited. The only IQ testing results are those of Dr. Subervi. He evaluated Plaintiff on two occasions upon request of the Office of Disability Determinations ("ODD"). In July 2002, Dr. Subervi estimated Plaintiff's intellect as mildly mentally retarded and diagnosed post-traumatic stress disorder, major depression, anxiety, and cannabis abuse. He also noted that Plaintiff was unable to read or write. (R. 245). Dr. Subervi evaluated Plaintiff again in September 2002 and administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III). Plaintiff obtained a full scale IQ of 69 (far below average), a verbal IQ of 71 (borderline), and a performance IQ of 73 (borderline).[11] (R. 238). Dr. Inatsuka evaluated Plaintiff in December

---

[11]In this circuit, it is presumed that an individual's IQ remains fairly constant throughout his life (absent evidence of sudden trauma that can cause retardation), and a valid IQ test meeting the listing criteria creates a rebuttable presumption that the condition manifested itself before age twenty-two. *Hodges v. Barnhart*, 276 F.3d 1265, 1269 (11th Cir. 2001).

2003, also upon request of the ODD. Plaintiff told the doctor that he had been in EH (emotionally handicapped) and SLD (specific learning disability) programs while in elementary and middle school but did not receive special education services in high school. Plaintiff also told her that he dropped out of school in the 11th grade after being expelled. Dr. Inatsuka administered the digit span and digit symbol-coding subtests from the WAIS-III to assess Plaintiff's short-term memory, concentration, and psychomotor speed. He scored within the average range for his immediate auditory recall but within the borderline range for his visual-motor speed and coordination. She addressed Plaintiff's adaptive functioning, noting that he lived with his parents and helped with chores, independently performed routine grooming and hygiene activities, prepared meals, had a driver's license and had no problem driving, rode a bicycle or took the city bus for transportation, shopped for groceries and ran errands, handled simple financial transactions, and spent his days working, doing chores, watching television, reading, and playing video games. He also dated, played video games, saw friends every weekend, occasionally attended church, went out to eat and to the movies, and interacted well with others. The doctor reported that, given Plaintiff's "presentation during the examination and level of daily functioning, there may be some exaggeration of his current symptoms." She diagnosed depression disorder, NOS; psychotic disorder, NOS; alcohol abuse; and cannabis abuse. She did not diagnose mental retardation or any other cognitive impairment. (R. 345-38). Upon reviewing Plaintiff's psychological and other records to date (2004), neither of the state agency doctors opined that Plaintiff was mentally retarded. One indicated a cognitive disorder, NOS (R. 352), and the other did not conclude

that Plaintiff had a cognitive impairment. The psychological treatment records do not bolster or refute Plaintiff's claim of mental retardation.[12]

Here, the ALJ rejected the full scale IQ score of 69 as conclusive of mental retardation on the basis that it was inconsistent with other record evidence including that of Plaintiff's daily activities and behavior, and therefore determined that Plaintiff's condition did not meet the listing criteria of 12.05(C). As indicated by Plaintiff, the ALJ addressed the IQ test results obtained by Dr. Subervi on September 18, 2002, which included a full scale IQ of 69 and which the doctor believed to be valid. (R. 17). The ALJ concluded, however, that Dr. Subervi's finding was "superceded by the preponderance of other reports, which show that the claimant can sometimes do better, and at least demonstrate that the low readings are not consistent as the Listing demands." *Id.* In support, the ALJ pointed to the results of informal testing conducted by Dr. Inatsuka, by which the doctor determined that Plaintiff was no worse than low average or even average in intellect on Wechsler Memory questions. The ALJ reasoned that the recency of these scores better indicated Plaintiff's current status. *Id.* at 17-18. The ALJ also considered Plaintiff's lifestyle in ascertaining if the nominal IQ score of 69 was truly reflective of his day-to-day capabilities and found that it was not. (R. 18). In particular, the ALJ pointed to Plaintiff's ability to read, work history, articulate behavior

---

[12] Plaintiff was treated at Tampa General Hospital Family Care Medical Center from January 2004 through December 2005. He primarily was treated for schizophrenia by way of drug therapy. He was terminated from care for forging a prescription for Tylenol #3. (R. 390-425). Plaintiff was also treated by psychiatrist Hafiz Muhammad A. Rahman, M.D., from June 2004 through April 2006. Dr. Rahman's treatment notes are sparse. They mainly reveal that Plaintiff was doing okay, was not hallucinating, was not depressed, and was prescribed Zoloft and Risperdal. (R. 441-46).

13

during the interview, and illegitimate sales activity (selling wax as cocaine). The ALJ also noted that even though Plaintiff dropped out of high school and stated he had been in special education classes, he progressed further through school than one would expect with an IQ of 69. Even assuming the IQ score of 69 was accepted as accurate, the ALJ reasoned that Plaintiff's condition(s) still would not meet the requirements of listing 12.05(C) because the evidence did not reveal an additional impairment significantly affecting Plaintiff's ability to work. (R. 18).

Upon a thorough review of the record, I conclude there is substantial evidence to support the ALJ's finding that the full scale IQ score of 69 as reported by Dr. Subervi was not credible because it was inconsistent with other evidence and because there was good reason to believe that Plaintiff exaggerated his problems. As the Commissioner points out, even though Dr. Subervi obtained a full scale IQ score of 69 for Plaintiff, his assessment and/or diagnosis of Plaintiff was borderline or extremely low functioning as opposed to mental retardation. (R. 238). Additionally, Dr. Subervi's notes reveal that Plaintiff may have exaggerated his symptoms and was not entirely honest because the doctor reported that Plaintiff was unable to read and write. (R. 245). Plaintiff's own admissions to doctors and the SSA refute that finding. Similarly, Dr. Inatsuka found Plaintiff to be operating at below average to average range based on the results of two subtests of the WAIS-III. (R. 347). She also indicated that, given Plaintiff's presentation during the examination and level of daily functioning, there may be some exaggeration of his current symptoms. *Id.* Another doctor indicated rule out malingering. (R. 297). In addition, while Plaintiff apparently received services through special education, he indicated he was in a specific learning disability and/or emotional

handicap program; he was not receiving special education services for mental retardation. Although I agree with Plaintiff that certain of the ALJ's reasons are not entirely persuasive, the balance of them are. Moreover, while the facts here are not as obvious as those in *Popp*, the same rationale applies. Accordingly, the ALJ did not err by discounting the full scale IQ score of 69 and his decision to do so is adequately supported.[13]  *See Popp*, 779 F.2d at 1499.

Finally, even had the ALJ erred at step-three of the sequential evaluation in determining that Plaintiff's condition did not satisfy the criteria under listing 12.05(C), the error would be harmless in light of the fact that there is no possibility of a different end result. Plaintiff ignores that the ALJ also found that even if Plaintiff were found disabled, his substance abuse would be a "material part" of any finding of disability thus precluding a finding of disability.[14]  Notably, Plaintiff does not challenge this finding on appeal. And, the record supports the ALJ's determination as cannabis abuse, alcohol abuse, and/or drug seeking behavior were noted repeatedly throughout the record. *See, e.g.* (R. 245, 297, 348, 351, 369, 390, 398). Plaintiff even told examining sources that he smoked marijuana at least

---

[13] Neither the ALJ nor the Plaintiff explicitly address the adaptive functioning aspect of listing 12.05(C) beyond noting Plaintiff's daily activities. Likewise, neither expounds on whether Plaintiff has a physical or other mental impairment that imposes an additional and significant work-related limitation of function. Although Plaintiff asserts that he does, the ALJ did not credit many of the claimed impairments and did not ascribe functional limitations to the ones that he did. As such, Plaintiff also fails to demonstrate this listing requirement.

[14] A claimant shall not be considered to be disabled if alcoholism or drug addition is a "contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). The key factor in determining whether drug addiction or alcoholism is a contributing factor material to the determination of a disability is whether the claimant would still be found disabled if he stopped using drugs or alcohol. *Doughty v. Apfel,* 245 F.3d 1274, 1279 (11th Cir. 2001); 20 C.F.R. § 404.1535(b)(1). "[T]he claimant bears the burden of proving that his alcoholism or drug addiction is not a contributing factor material to his disability determination." *Doughty,* 245 F.3d at 1280

twice a day and that he engaged in binge drinking. (R. 244, 346). While no doctor commented on whether Plaintiff would be disabled based on his level of cognitive functioning absent his drug and/or alcohol use, the ALJ's finding that it is likely that such played a role in his poor cognitive performance upon being evaluated by Dr. Subervi is somewhat convincing in light of the record as a whole. Consequently, remand would not be required. *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); Fed. R. Civ. P. 61.

IV.

For the foregoing reasons, the decision of the Commissioner of the United States Social Security Administration is in accordance with the correct legal standards and is otherwise supported by substantial evidence. The decision is affirmed. Accordingly, the Clerk is directed to enter Judgment in favor of the Defendant and to close the case.

**Done and Ordered** at Tampa, Florida, this 30th day of September 2008.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of record